1

1    IN THE UNITED STATES DISTRICT COURT FOR THE

2    DISTRICT OF HAWAII

3    UNITED STATES OF AMERICA,    )    CRIMINAL NO. 02-00176DAE
                                  )
4         Plaintiff,              )    Honolulu, Hawaii
                                  )    June 1, 2004
5         vs.                     )    1:38 p.m.
                                  )
6    (08) JASON APELA GONSALVES,  )    SENTENCING TO COUNT I OF
     aka "JAY,"                   )    THE FIRST SUPERSEDING
7         Defendant.              )    INDICTMENT AS TO
     _____  )    (08) JASON GONSALVES
8                                      UNITED STATES' MOTION FOR
                                       DOWNWARD DEPARTURE
9
                    TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HONORABLE DAVID ALAN EZRA,
              CHIEF UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12
     For the Government:         THOMAS MUEHLECK, Esq.
13                               Assistant U.S. Attorney
                                 District of Hawaii
14                               Room 6100 - PJKK Federal Bldg.
                                 300 Ala Moana Blvd.
15                               Honolulu, Hawaii 96813

16

17   For the Defendant:          DAVID KLEIN, Esq.
                                 Davies Pacific Center
18                               841 Bishop Street, Suite 2116
                                 Honolulu, Hawaii 96813
19

20

21

22   Official Court Reporter:    Cynthia Tando Fazio, RMR, CRR
                                 United States District Court
23                               P.O. Box 50131
                                 Honolulu, Hawaii  96850
24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).



EXHIBIT "C"

```
 1   TUESDAY, JUNE 1, 2004                          1:38 P.M.
 2         THE CLERK:  Criminal 02-176DAE, United States of
 3   America versus defendant eight, Jason Gonsalves.
 4         This case is being called for a Sentencing and
 5   Government's Motion for Downward Departure.
 6         Counsel, please state your names for the record.
 7         MR. MUEHLECK:  Good afternoon, Your Honor.  Tom
 8   Muehleck and FBI Special Agent Dan Brady for the United
 9   States.
10         THE COURT:  All right.  Good afternoon.
11         MR. KLEIN:  Good afternoon, Your Honor.  David Klein
12   appearing on behalf of Mr. Gonsalves, who's present, Your
13   Honor.
14         THE COURT:  All right.  Good afternoon.
15         You can be seated, Mr. Klein.
16         Mr. Klein, before we go any further have you and your
17   client had a full and ample opportunity to read, review,
18   discuss and file any objections to the presentence
19   investigation and report?
20         MR. KLEIN:  Yes, we have, Your Honor.
21         THE COURT:  All right.  On March the 12th, 2003, the
22   defendant pled guilty to conspiracy to distribute and possess
23   with intent to distribute in excess of 50 grams of
24   methamphetamine, in violation of 21, United States Code,
25   Section 846, which was Count 1 of a 35-count indictment.
```

1          There is a plea agreement in this case.  The court is
2     ready to rule on that unless there is some objection from
3     counsel?

4          MR. MUEHLECK:  No.  We ask the court to keep the plea
5     agreement, Your Honor.

6          MR. KLEIN:  No objection, Your Honor.

7          THE COURT:  All right.  The court hereby accepts the
8     Rule 11(e)(1)(A) plea agreement entered into between the
9     parties in this case because I am satisfied that it does
10    adequately reflect the seriousness of the defendant's offense
11    behavior and does not undermine the statutory purposes of
12    sentencing.

13         There were no objections to the factual statements
14    contained in the presentence report and the court adopts that
15    as its findings of fact.

16         There were no objections to the presentence report's
17    conclusions as to the applicable guidelines; the court adopts
18    those.

19         The offense level is 37, the criminal history
20    category is one, the imprisonment range is 210 to 262 months,
21    probation is not available, five years of supervised release
22    and a fine of 20,000 to $4 million, and restitution is not an
23    issue in this case.

24         Now, there has been a Motion for Downward Departure
25    filed by the government for which the defendant has joined and

1    filed an additional request.  So I will hear from you first,
2    Mr. Muehleck.

3           MR. MUEHLECK:  Thank you, Your Honor.  Your Honor, we
4    made our motion based on --

5           THE COURT:  Just a minute.  I need a pen.  Just a
6    minute.

7           Yeah.  Mr. Muehleck?

8           MR. MUEHLECK:  Your Honor, we made our motion based
9    upon the defendant's cooperation at the time of his arrest.
10   He was one of the first to be arrested and he cooperated
11   immediately upon his arrest, pretty much gave it up.  At that
12   point the FBI was able to represent in a generic fashion that
13   they had a cooperating defendant in the case.

14          Subsequent to that -- without naming the individual
15   that was cooperating.  Subsequent to that there were people
16   that wanted to be debriefed and did enter into a plea
17   agreement.  In particular, Mr. Tasi Malepeai was one of the
18   ones that was represented by Mr. Green; Mr. Green determined
19   that there were people cooperating and he immediately asked to
20   have his client debriefed and subsequent to that, court is
21   aware, entered into a plea agreement, pled guilty.  There have
22   been no defendants in this case who have gone to trial.  There
23   is one defendant left, Your Honor.  And we think a downward
24   departure to represent the defendant's and to accommodate and
25   acknowledge his cooperation is appropriate.

 1          The defendant's guideline is 37.  We'd ask the court
 2    to go down to a level 35 and sentence at the bottom of that
 3    guideline range, Your Honor.  Thank you.
 4          THE COURT:  All right.  A level 35 would result in a
 5    sentence of 168 to 210 months.
 6          MR. MUEHLECK:  Yes, Your Honor, we did that realizing
 7    that we started from -- if we start from the middle range of
 8    37, that's approximately 240 some months, which is 20 years.
 9          THE COURT:  20 years.
10          MR. MUEHLECK:  And down two levels to that would be
11    approximately 13 years, somewhere around there, Judge.
12          THE COURT:  Yeah, it's a huge difference.
13          MR. MUEHLECK:  33 percent --
14          THE COURT:  We're still talking --
15          MR. MUEHLECK:  -- reduction.
16          THE COURT:  Still talking about a lot of time,
17    though.
18          MR. MUEHLECK:  There's a lot of time and there's a
19    lot of reason for that time, Judge, if you look at the amount
20    of drugs involved, defendant had a weapon.  Even after he was
21    stopped in January he continued, apparently, in the endeavors
22    that he was in, as referenced by the search warrants.  And
23    what's not mentioned in the presentence report is that Agent
24    Brady called the defendant after his arrest, after his arrest
25    by the Honolulu police in January and gave him an opportunity

1    to come in, solicited his assistance, gave him a chance to get

2    out of this.  This is before his April arrest.  And the

3    defendant rebuffed him claiming that that -- he didn't want

4    anything to do with it, you're talking to the wrong guy.

5            THE COURT:  With that?

6            MR. KLEIN:  With that, Your Honor, obviously I'd like

7    to go over the numbers myself as well.  And Mr. Muehleck had

8    indicated that down to level 35 would be approximately 13

9    years.  I believe that would be -- it would be more accurate

10   to say the low end of that guideline range is 14 years, not 13

11   years.

12           In any event, the low end of the guideline range,

13   even though where Mr. Gonsalves starts at, the low end of that

14   is 17 years, Your Honor.  The government at this point has

15   recommended the low end, I presume that would be 168 months,

16   which is approximately more than 14 years.

17           THE COURT:  But, Mr. Klein, make no mistake about it,

18   with serious drug dealing, with guns and everything else that

19   we're talking about here, this court would not be imposing,

20   absent a Motion for Downward Departure, I would have imposed a

21   sentence toward the high end of the guidelines in this case.

22           MR. KLEIN:  Your Honor, I understand that, and I

23   think that's why the family is here, friends are here, Your

24   Honor.  That's why --

25           THE COURT:  Well, the family and the friends, I'm

1    delighted that they're here, I'm delighted that they're

2    supporting him, but they weren't carrying guns around and drug

3    dealing.

4            MR. KLEIN:  And I understand that, Your Honor.  And

5    that was -- and that's why we're obviously appreciative of the

6    government filing the Motion for Downward Departure.  But

7    there are certain factors that I think that are laid out under

8    the guidelines that the court takes into consideration when

9    determining the extent of the guideline.  And when we look at

10   those -- and when we look at those considerations, Your Honor,

11   I think this case does cry out for more than just -- more than

12   a two-level guideline range.  And the reason I say that, Your

13   Honor, is because, one, what had happened in this circumstance

14   when he was arrested by the United States government, he did

15   cooperate immediately.  He was completely truthful.  And I'm

16   going down now, you know, the extent -- when the court

17   determines under 5K1.1 the extent of the guidelines.

18           He gets arrested, he goes ahead, he makes an

19   unprotected statement at that point.  We're now not dealing

20   with a circumstance where he's represented at that time in

21   which there was any type of 1B1 letter or anything like that,

22   which is, as the court knows, is very common practice where

23   what would happen normally is a person gets arrested, if they

24   have counsel or something like that, before they would

25   cooperate they would go ahead and request some type of

1    protection regarding that.

2         Those statements that he gave at that point obviously
3    were truthful.  He talked about his drug dealing.  He talked
4    about the extent of his drug dealing.  It did not appear from
5    the statements that were provided to me that there was any
6    type of minimization by Mr. Gonsalves at that point.  He
7    provided information not -- and we're not talking about the
8    individuals that he provided information were the underlings,
9    where people who were, you know, what you would call couriers,
10   he was talking about the two individuals in this case who
11   were, you know, the major one and two, Tasi and Amako, and he
12   gave that information immediately.  Not only did he do that,
13   Your Honor, but obviously we met subsequent to that time -- we
14   had a proffer letter subsequently, but it didn't really matter
15   at that point -- discussing with Mr. Brady whatever he knew at
16   that point.  Not only that, but Mr. Gonsalves was willing to
17   testify.  And the fact that no one went to trial, I mean that
18   may say something, but it also may say that Mr. Gonsalves was
19   willing to testify.

20        This sentencing date on this matter had been
21   continued previously, Your Honor.  The reason it had been
22   continued previously is because of the fact that Mr. Gonsalves
23   was willing to testify at whatever trial came forward and
24   because of the trial schedules, because of the ongoing nature
25   of this case, the fact is, is that he's now been in pretrial

1    custody even though he admitted early on immediately upon his

2    arrest of the offense of approximately -- he's been in for

3    more than two years at this point in pretrial custody awaiting

4    the sentencing and continuing his cooperation during this

5    period of time.

6            So it's not just a matter of just this initial

7    cooperation, you come over and you make a statement.  It's

8    more than just that.  He was willing to testify, he was

9    willing to go over on whatever he did.

10           And the court points and Mr. Muehleck points and the

11   court correctly points to obviously the offense itself, which

12   is -- which is a very serious type of offense and it does

13   involve a gun and it involves an extensive amount of drugs.

14   Those factors are clearly taken into consideration under the

15   guidelines and we take them into consideration.  That's why

16   Mr. Gonsalves is at such -- such a high level at this point.

17           Well, on the flip side of it, what we have is a

18   person who's in criminal history category one.  What we also

19   have here is, as I've laid out to the court, is some other

20   factors that the court may want to consider for a downward

21   departure.  And one of the things that I think is important

22   for this court to understand, and I'm sure the court caught

23   this flavor of the love and the feeling, you know, that is out

24   there for Mr. Gonsalves from his family and his friends.  One

25   thing that is unusual for Mr. Gonsalves, and I think atypical

1    for a lot of defendants who come here, is that he has his

2    girlfriend, he has someone he has two children with.  This

3    isn't someone who he just met.  This isn't someone that he has

4    gone from one relationship into another relationship with over

5    years or whatever.

6              THE COURT:  Where is his girlfriend?

7              MR. KLEIN:  His girlfriend is sitting right over here

8    and his one child is here as well, Your Honor.

9              THE COURT:  Who is the girlfriend?

10             MR. KLEIN:  She's sitting over here and the child is

11   right over here, Your Honor.

12             THE COURT:  The child is there and the girlfriend is

13   there?

14             MR. KLEIN:  Well, I mean, my children often --

15             THE COURT:  Where is the girlfriend?

16             MR. KLEIN:  Could you please stand up?

17             THE COURT:  That's the girlfriend?

18             MR. KLEIN:  Yeah, that's her.

19             THE COURT:  So how long has she been his girlfriend?

20             MR. KLEIN:  About ten years now.

21             THE COURT:  So you have to explain to me why for

22   eight years while she was his girlfriend and for a period of

23   time when he had the child -- he's got two children? -- he was

24   dealing drugs.

25             MR. KLEIN:  It was a disaster, Your Honor.  He says

1    it himself.

2            THE COURT:  To say the least it was a disaster.

3            MR. KLEIN:  No, he says it in the letter that he's

4    written to the court, Your Honor, and there's no question

5    that, you know, what he says in his letter and what he had

6    said to this court, Your Honor, is that's the thing he's --

7    he's most sorry for.  I mean, not only is he sorry to the

8    community, not only is he sorry to the court, but as he says

9    in his letter, Your Honor, says:  "I find it difficult to see

10   my daughters when they visit me.  How do I explain why they

11   have to see daddy in this building or why can't I go home with

12   them.  My daughters are young.  One day I will have to face

13   the pain of telling them.  I deeply regret what I have done to

14   my family, society and the government.  I pray to God each day

15   to forgive me of my sins.  In one respect this shameful period

16   of my life can be looked upon as a blessing in disguise.  I am

17   still alive and I am turning my life around for the better."

18           You know, so what I'm trying to say to this court is

19   that his relationship -- and obviously what he was doing was

20   out of control and he -- I mean it's hard to stand here and --

21   I mean, no one is trying to justify the time that he was

22   dealing drugs and the times that he was involved with that.

23           THE COURT:  You know, the problem I have is that I

24   get letters from local families -- I'm not talking about

25   people living in Kahala and in East Honolulu, I'm talking

1    about people living in Palolo and Waianae and over here in

2    Mayor Wright housing, letters to me:  Judge, please, you've

3    got to do something about these drug dealers.  These drugs are

4    coming directly into our schools.  My young son got picked up

5    for drugs.  This and that.  Well, your client was exactly,

6    personally responsible for doing a lot of that kind of damage.

7    The drugs he helped distribute went right into the schools.

8         MR. KLEIN:  Your Honor, it's a -- you know what, the

9    family themselves, the friends themselves here agree with you

10   on all -- I mean everyone is in agreement on this.  And most

11   of all Mr. Gonsalves is in agreement on it.  And sometimes, I

12   mean, people are doing these things, they get -- I mean, you

13   know, Your Honor, I don't know how it happens.  I mean if we

14   knew how it happens, how people go ahead and start using drugs

15   and then start dealing drugs, I mean we can make a lot of

16   money if we knew how to stop it, Your Honor.  I mean, you

17   know, I have young children, everyone -- you know, you have

18   children here, you have everyone that has children here.  And

19   we all sit here and we all think to ourselves:  How do we go

20   ahead and we stop this as a community?  I know one answer is

21   putting -- is putting people in jail.

22        THE COURT:  Well, it's not my answer necessarily, but

23   it's Congress' answer and I've got to follow the law.

24        MR. KLEIN:  And I --

25        THE COURT:  -- don't necessarily disagree with it by

1    the way.

2            MR. KLEIN:  And I understand that, Your Honor.  And
3    Mr. Gonsalves, regardless of what this -- the court's going to
4    do, is going to be punished for a long time.  He's punished --
5    his family right now, he has an opportunity to see his
6    children once a week at this point.  I mean once a week.
7    That's it.  His child that was born a few months after he was
8    incarcerated, the only time he ever saw the child, and I would
9    go out to the facility, I think it's on Thursday mornings or
10   Tuesday mornings and you would always see the child -- him
11   with the children and all that.  That's all gone now.  I mean
12   even that temporary -- that temporary time that they have
13   together, that one hour a week or two hours a week of him with
14   his children is now gone.  I mean that -- that is as many
15   years as that's going to be.

16           And I'm not saying this because -- to put the blame
17   on someone else.  I mean we just -- I'm trying to, you know,
18   make the -- have the court understand the impact that years in
19   jail has on people's lives.  And the court is obviously well
20   aware of it, but we're looking now with individuals.  And this
21   is different than the average individual who comes into court
22   without family, without the friends, who's had six children
23   from six different wives or different girlfriends if he's had
24   six -- if he's had that over that period of time.  What you
25   have instead here is you have a person who has made horrible

1    choices in his life.  Who has -- who had tried when he got

2    arrested at that point, tried to do the right thing and did

3    the right thing by cooperating with the government by being

4    willing to testify, by going ahead and doing that.  And that's

5    the system that we -- that we all work in.  I mean the system

6    that we work in, Your Honor, is a system where the sentences

7    are long and people cooperate and as a result of their

8    cooperation, you hope that the sentence is going to be reduced

9    upon it.

10              But in Mr. Gonsalves' case as well there are other

11    factors as well.  And one thing that I thought was very

12    interesting that his aunt, Michelle Gonsalves, pointed out in

13    a letter to you, and what she pointed out was his attainment

14    of his diploma, high school diploma while he was in prison,

15    Your Honor.  And while that may seem small to -- you know, to

16    those of us who have gone on to graduate school, you know, at

17    least it's nice to see that he didn't waste the two years

18    while he was incarcerated just sitting there playing

19    basketball or watching TV.  I mean the letters that he has

20    provided, the certificates that he has provided.  I mean

21    attaining the GED is hopefully, as Ms. Gonsalves puts it, when

22    he gets out will open up some doors for him.  Too bad he

23    didn't recognize that earlier, and I think that we all feel

24    bad about that and clearly Mr. Gonsalves feels bad about that.

25              But we're here to determine a sentence on an

1    individual who has never been in jail before, who's in a
2    criminal history category one, who as a result of having this
3    stupid gun with him in his car gets hit up an additional four
4    levels, Your Honor.  And not -- I'm not saying it's not
5    justified, I'm just putting -- I'm just indicating that the
6    impact of that is no safety valve, the impact of that is a
7    two-level bump, the impact is if you complete the 500-hour
8    drug program, they don't given you the year off on that, and
9    that's understandable.  I mean that's what we have -- society
10   has determined.  But all of those things have been taken into
11   consideration when determining his sentence.

12           And the -- when we look at all of these factors, his
13   cooperation, the fact that it was immediate, the fact that he
14   went ahead and he did all of the -- he continued his
15   sentencing, he's been in pretrial for more than two years,
16   what he has done during this period of time, I would ask the
17   court to depart more down to the 120-month range, Your Honor.
18   That's the mandatory minimum that he's facing.  Ten years in
19   jail is still a long time in jail and it's not something --
20   there's no parole, there's no drug program, we're not talking
21   about just, you know, 30 days or 60 days or something like
22   that.

23           And, you know, does he deserve it?  Well, you know,
24   he tried.  I mean he tried once he got arrested.  He tried to
25   cooperate, he did cooperate with the government and that's why

1    they filed a motion.  And when you look at the factors that

2    are taken into consideration, Your Honor, I think it does

3    merit more than a two-level downward departure.

4           If the court would like -- Mr. Gonsalves would like

5    to address the court as well.

6           THE COURT:  You have every right to address the

7    court.  You don't have to stand up.

8           MR. KLEIN:  What happened is over the weekend he was

9    injured with a cart.  Someone had pushed a cart at the

10   facility and they ripped his leg open, Your Honor.  So that's

11   the problem.

12          THE DEFENDANT:  Your Honor, like to apologize to the

13   government, my family, society, my daughters for the wrong

14   that I've done.

15          Being incarcerated has taught me a lot of things.

16   Learned how to put my priorities in straight, follow down the

17   right path.

18          When I got arrested, I cooperated with the government

19   and told them everything I knew.  And now I'm being sentenced

20   by what I -- by the information that I gave 'em.

21          In this system there's, like, two types of people;

22   the ones who learns off their mistakes, change their lives

23   around for the better and the ones that continue the same

24   lifestyle.  I can assure you that after this you won't be

25   seeing my face again because I have two daughters and a father

1    that's in jeopardy.  Thank you.

2           THE COURT:  Mr. Muehleck, anything else from the

3    government?

4           MR. MUEHLECK:  Well, again, we believe a departure is

5    appropriate, but not to the extent that Mr. Klein has asked

6    for.  He asked to go down for at least -- from 210 to 120.

7    That's at least 90 months and more like 120 months, ten years.

8           THE COURT:  Well, these situations are often

9    difficult for the court because we're looking at a substantial

10   amount of federal prison time.

11          We have the defendant here who is of the opinion, I

12   guess, that he enhanced his own prison time by being honest

13   with the government.  The fact of the matter is the government

14   would have found out about the drugs in any event and he would

15   be serving 20 years in prison without parole.

16          He would have done himself a tremendous amount of

17   good had he cooperated with the FBI right off the bat.  When

18   they first talked to him, when the agent called him and he had

19   his opportunity to go in there and cooperate, he could have

20   effected the manner and mode in which he was charged and at

21   that point could have been a real benefit to them.

22          And by basically telling the agent forget it, until

23   he eventually got arrested, that's when he hurt himself

24   substantially.  That's when he put himself in some jeopardy.

25          So Mr. Muehleck is absolutely correct there.

1          How much before he was arrested was he contacted by
2    Agent Brady?

3          MR. MUEHLECK:  About a month or month-and-a-half.

4          THE COURT:  Wow.  That's a long time.

5          So he -- he had an entire month to month-and-a-half
6    in which he could have really done some good for himself and
7    instead he was hard head and continued to try to play the
8    game.  And that's what really cost him.  Of course, when he
9    got arrested then he realized the gig was up and cooperated.
10   At least he helped himself to that extent, but he really could
11   have helped himself if he had gone to Agent Brady right off
12   the bat.  That would have made a huge difference.

13         So a lot of the argument, Mr. Klein, that you make on
14   his behalf he gave away when he didn't go to Agent Brady
15   initially.  So we've got that problem.

16         And secondly, of course, the defendant -- and his
17   family here, of course, they support him, they love him and
18   they're concerned about him and necessarily so and
19   understandably so.  But, on the other hand, as I said before,
20   I get letters and telephone calls from countless people
21   wanting to know what can be done about this ice problem that's
22   just rampaging through our community and in particular areas
23   like Waianae and Kalihi, Palolo Valley, all the public housing
24   areas.  Not to say that it doesn't impact everybody.  I mean
25   every school, my school has had problems.  I went to St. Louis

1    High School, they've had problems there.  Punahou School has
2    had problems.  This isn't just families that live in Kalihi,
3    that's for sure, but they've got a very serious problem there.
4    In the community groups I've talked to, I've been out to the
5    housing areas to work with the kids myself in programs to try
6    to keep them -- working with Skip Adias and those people to
7    try to keep these kids straight and out of drugs.

8              In the meantime, we've got people like Mr. Gonsalves
9    bringing in as much drugs as they can get their hands on and
10   shoving them out toward the kids so that they can get hooked
11   and use them.  And then he gets caught and of course everybody
12   says:  Gee, this is awful.  Well, it is awful.  It's not only
13   awful that he was involved, it's awful what he did and those
14   that were with him did and they did it for one reason and one
15   reason only:  Money.  That was it.  Don't care about the
16   consequences, don't care about some kid getting high and
17   robbing something to keep his habit, don't care about kids
18   getting high in the bathroom, don't care about mothers, you
19   know, trying to find out where their kids are, can't find
20   them.  They're out getting, you know, doped up.  As long as we
21   get the money, that's what counts.  And that's a problem for
22   the court, it's a problem for Congress, it's a problem for the
23   community.

24             And then to add insult to injury he's driving around
25   with a gun, which is not good.  He's very lucky he's sitting

1    here actually because not too long ago we had a guy driving
2    around with a gun doing drugs and he ended up getting shot to
3    death by the police department.  And then, of course, there
4    are those that end up becoming the victims of their own,
5    quote, unquote, drug-dealing friends who get worried that they
6    might be turning on them and they find them in the cane field
7    or on the dock, like they found one the other day, or head
8    first down in a sewer because they don't want to go to jail,
9    so they're afraid the guy is going to talk so they just kill
10    'em.

11        So as bad as this is, it's a lot better than being
12    over at Borthwick Mortuary, which is where a lot of mothers
13    end up, sadly, and wives looking at their husbands or sons in
14    the casket.

15        The defendant has moved for a downward departure
16    based upon several factors, none of which really constitute
17    extraordinary factors which take this case out of the
18    heartland in the guidelines.  He will be separated from his
19    family, but everyone who is incarcerated and put in jail is
20    separated from their family.  We get countless numbers of
21    people here with young children.  It's just not unusual.

22        And the other factors just don't -- post-offense
23    rehabilitation.  I'm not unhappy about him.  I think he's done
24    a great job in terms of going to school, but then again, that
25    isn't that unusual either.  We get plenty of people who take

1    advantage of the programs, and I'm delighted that he has for

2    his benefit, but it isn't taking it out of the heartland.

3            And his acceptance of responsibility.  Well, he's

4    getting credit for that.  And when he really could have helped

5    himself when the agent contacted him about a month-and-a-half

6    before he finally got arrested, that's when he really could

7    have helped himself with acceptance of responsibility.  And he

8    didn't do that.

9            And, of course, the incarceration on the Mainland,

10   that's a fact of life.  Don't have a full-time federal prison

11   here in Hawaii.  They have a detention center but not for

12   people who are serving sentences for a year-and-a-half or

13   more.

14           So, basically, all of the grounds requested for

15   downward departure are not grounds upon which this court finds

16   are legitimate in this context.

17           Now, the government has moved for a downward

18   departure down to level 35.  Now, the sentencing range is 210

19   to 262 months.  Someone who was dealing as much crystal meth

20   as the defendant -- or methamphetamine -- driving around with

21   a gun in this court would normally get a sentence at the high

22   end of the guideline range, very close to 260 months, because

23   that's very serious conduct.  You know, this argument:  Well,

24   he's only got a criminal history category of one doesn't hold

25   any water with the court.  John Gotti only had a criminal

1   history category one, too, but it doesn't mean he wasn't a

2   career criminal.  What it meant is he didn't get caught or

3   didn't get convicted.  The defendant was dealing drugs for a

4   substantial period of time.  A lot of drugs.  So, I mean, if

5   he had criminal history category two, he would be looking at

6   life in prison -- or three with this kind of a crime.  So

7   criminal history category one helps him, but it doesn't excuse

8   his conduct.

9           So the low end of the guidelines mean nothing in this

10  context because he would be looking at the high end of the

11  guidelines.  Over 20 years.  240 months is 20 years.  So you

12  would be looking at about almost 22 years in prison without

13  parole.

14          And there are plenty of people who have been

15  sentenced to that kind of sentence in these courthouses.

16          Now, the government has moved for a downward

17  departure to a level 35.

18          Did somebody say something?  I thought I heard

19  something.  Mr. Muehleck?

20          MR. MUEHLECK:  No.

21          THE COURT:  Okay.  I'm sorry.

22          Downward departure to level 35, which is a range of

23  168 to 210 months.  If I sentenced the defendant to 168

24  months, that is a downward departure from what he would have

25  gotten of several years, many years actually.

1            Help me, Mr. Muehleck.

2            MR. MUEHLECK:  Well, it would be almost, Your Honor,

3    almost ten years.

4            THE COURT:  Yeah.  That would be almost ten years off

5    his sentence.

6            MR. MUEHLECK:  Nine-and-a-half years, Your Honor.

7            THE COURT:  It still means he's got a substantial

8    length of time to serve.  But it is substantially less than he

9    would have served.

10           The real shame here, as I have said this before, when

11   Agent Brady went to him and offered him the opportunity to

12   help early on, if you would have -- yes?

13           MR. KLEIN:  No, I was just going to address that

14   issue, Your Honor.  May I?

15           THE COURT:  Address it?

16           MR. KLEIN:  Address that issue, Your Honor.  I mean I

17   know that the court has pointed that out several times.

18           THE COURT:  That's right.

19           MR. KLEIN:  And I understand that and that's real

20   important.  It may not -- I don't know how much it would

21   really -- I don't know in that one month difference, as far as

22   the extent of what the government would be moving for, the

23   two-level down, whether or not that would have any impact.

24           THE COURT:  Mr. Klein, you miss the point.

25           MR. KLEIN:  Mm-hmm.

 1                THE COURT:   It's not what the government would do --

 2           MR. KLEIN:   No, I understand that.

 3           THE COURT:   -- it's the way I look at it.

 4           MR. KLEIN:   Mm-hmm.

 5           THE COURT:   Do you understand there's a huge

 6     difference between someone who either comes forward

 7     voluntarily or when they're called by the agent, says:   You

 8     know, you're absolutely right, what I've been doing has been

 9     wrong.   I'm going to come down there and I'm going to help you

10     120 percent right now.   If -- if he had done that, I would be

11     looking at giving him a substantially greater downward

12     departure.   But instead, he continues to do what he's doing

13     even after he's called by the agent and then after he's

14     arrested he cooperates.

15           MR. KLEIN:   No, I understand that.

16           THE COURT:   We're talking about two different worlds

17     here, Mr. Klein.

18           MR. KLEIN:   No, I wish -- I wish all my clients would

19     do the first thing, Your Honor, obviously, is when the

20     agent -- obviously, that the agent -- as soon as the agent

21     calls for them to cooperate.

22           THE COURT:   You know, Mr. Klein, I once had a fellow

23     who was just -- I think it may have been Mr. Muehleck's case

24     actually.   I don't know whether you were involved.   But this

25     was a guy who was a drug courier going back and forth to the

 1    Mainland bringing in substantial amounts of crystal meth.  On

 2    his own one day he decided:  This is really terrible what I'm

 3    doing to the people of Hawaii.  I've been bringing these drugs

 4    in to go to the schools.  And on his own, he never was

 5    arrested at Honolulu Airport, nobody even knew he existed, on

 6    his own he goes to the FBI office and turns himself in.

 7            MR. KLEIN:  That's very impressive, Your Honor.

 8            THE COURT:  Well, it is.  And he got a huge downward

 9    departure from this court as a result of it.

10            MR. KLEIN:  Well, I understand that, Your Honor.

11    Unfortunately, the way the practice works, Your Honor, in most

12    cases that we see here in front of this court is that -- is

13    that the cooperation happens after they are arrested.  And

14    oftentimes the cooperation doesn't happen as quickly as it did

15    in this case.  Oftentimes the cooperation may not happen for

16    months after a person is arrested and after they're trying to

17    negotiate some sort of plea and a proffer is done and a letter

18    is done and all that sort of thing.

19            And in that circumstance, that is -- Mr. Gonsalves is

20    different in that circumstance because quite honestly I think

21    Mr. Gonsalves is the unusual circumstance in which the

22    individual does cooperate immediately after the arrest, Your

23    Honor.  That doesn't even happen all the time and you would

24    think it would, Your Honor.  But Mr. Gonsalves at least

25    acknowledged it at that point.  He didn't at that point, even

1    though it was his right, they advised him that he had the

2    right to remain silent and that anything he said could be used

3    against him and that he had the right to have an attorney

4    present, even though they advised him of those things he still

5    went forward and cooperated, knowing that everything he

6    said --

7         THE COURT:  Believe me, I don't think that's a small

8    thing.  I think it helps him a lot.  I mean even if the

9    government's insist -- if he had done that, he would be

10   looking at, I told you, at 22 years in prison.

11        MR. KLEIN:  No, I understand that.

12        THE COURT:  Instead of 22 years, even the government

13   is requesting almost a ten-year downward departure.  So that's

14   a -- ten years is a huge amount of time, Mr. Klein, as you

15   well know in this federal system.  It's not like the State

16   system; people get sentenced to 20 years and they're out in

17   two years.  You're sentenced to 20 years in the federal

18   system, you serve 20 years.

19        MR. KLEIN:  You know, Your Honor, there's no question

20   about it, ten years is a lot of time and, you know,

21   unfortunately when we -- as defense attorneys, when you look

22   at -- when you look at these things and you look at the, you

23   know, the guideline range and you look at it at 210 to 168, I

24   mean, what I'm saying is you're looking at the low end of the

25   guidelines and you're looking at it in that context --

1           THE COURT:  Maybe if there hadn't been a gun.

2           MR. KLEIN:  Oh, if there hadn't been a gun, we'd

3    probably be looking at five years at this point, Your Honor.

4    I think that there would be safety valve, there would be --

5    you know, there wouldn't be no enhancement on it, I think we

6    would be looking at a lot less.  Just even without the gun,

7    and from the day I met Mr. Gonsalves that's always been our

8    primary concern.  I mean primary concern, I mean it's -- look,

9    guns and drugs don't mix.  I mean there's no question about

10   that.  And the punishment, you know, does -- is taken into

11   consideration -- takes that into consideration very strongly

12   and I think with good cause.

13           But when we're also talking about someone going to

14   jail for, as the government recommends, the guideline range of

15   14 to 17 years, although I think they have indicated they

16   would recommend the low end of the guidelines, 14 years,

17   there's no parole in this system and we go back to it and

18   that's 14 years that an individual does.  And that's 14 years

19   that someone has done who has cooperated with the government

20   upon his arrest, who gave a full and complete statement, who

21   did everything he could, was willing to testify in that

22   behalf, who should have done it earlier on and should not have

23   gotten involved in the first place and is going to pay a very

24   strong price.  Whether the court sentences him to 14 years or

25   sentences him to a lower sentence that we hope, he's going to

1    face this the rest of his life and his family is going to face
2    it and his daughters are going to face it, but it's still a
3    long time.  And -- and that's all -- and we know that.

4            It's -- you know, that's why we ask for less, Your
5    Honor.  I mean if we were talking about where there was the
6    possibility of parole, where the BOP themselves or if there
7    was a parole board, then 14 years wouldn't be that long.  But
8    14 years when you're talking about not being -- basically not
9    being able to get a year for a drug program, maybe you get
10   like two years off for good time, you're still looking at a
11   12-year sentence at this point, Your Honor.  And given his
12   cooperation, we would ask for a lesser sentence.

13           THE COURT:  The court is ready to impose sentence.
14           Pursuant to the Sentencing Reform Act of 1984, it is
15   the judgment of the court that the defendant Jason Gonsalves,
16   also known as Jay Gonsalves, is committed to the custody of
17   the Attorney General of the United States or his authorized
18   representative to be imprisoned for a term of 150 months.

19           After he has completed the term of imprisonment, he
20   must serve a five-year term of supervised release.  During the
21   term of supervised release, he is to abide by the following
22   specific conditions:

23           He must observe the standard conditions of
24   supervision.

25           He shall not commit any federal, state or local

1    crimes.

2         He must not possess any illegal controlled
3    substances.

4         He must refrain from any unlawful use of a controlled
5    substance.  He must submit to one drug test within 15 days of
6    release from imprisonment and at least two drug tests
7    thereafter as directed by the probation office.

8         Shall participate in a substance abuse program, which
9    must include drug testing at the direction of the probation
10   office.

11        Prohibited from possessing a firearm as defined in 18
12   U.S.C. 921.

13        Prohibited from possessing any illegal or dangerous
14   weapons.

15        Must provide the probation office access to any
16   requested financial information.

17        Shall submit his person, residence, place of
18   employment and vehicle to a search conducted by the probation
19   office at a reasonable time and in a reasonable manner based
20   upon reasonable suspicion of contraband or evidence of a
21   violation of a condition of supervision.

22        Failure to submit to a search may be grounds for
23   revocation.  You must warn any other resident the premises may
24   be subject to search pursuant to this condition.

25        He is prohibited from possession and use of alcohol.

1              Defendant doesn't have the assets to pay a fine, so
2      the court will not impose one.

3              There is no restitution in this case.

4              He must pay a special assessment of $100.  That's
5      mandatory.

6              The defendant has waived pursuant to his plea
7      agreement his right to appeal the sentence this court has just
8      imposed.  The Ninth Circuit Court of Appeals has upheld these
9      waivers as being valid and lawful.  So no appeal is available
10     to the defendant.

11             He does, however, have the right to make a collateral
12     attack at a later time, which was reserved in his plea
13     agreement, to his sentence based upon one ground and one
14     ground only, and that is ineffective assistance of counsel if
15     he wishes to make that attack at a later time.

16             Is there any place in particular he would like to
17     serve his sentence?

18             MR. KLEIN:  Your Honor, he would ask, I don't know if
19     it's going to be possible, for him to be designated to Nellis
20     camp.  And if not --

21             THE COURT:  No, they won't send him to Nellis, not
22     with a gun charge, drugs and this kind of sentence.  We're
23     wasting our time.

24             MR. KLEIN:  Safford, Your Honor.  He asks for Safford
25     or Lompoc or --

```
 1              THE COURT:  All right.

 2              MR. KLEIN:  -- or Terminal Island.  And he would ask

 3     for the drug program.  If there can be a recommendation for

 4     the 500-hour drug program.

 5              THE COURT:  I thought you were arguing he couldn't

 6     get into the drug program?

 7              MR. KLEIN:  Well, he may be able to get into the

 8     program, but he won't be able to receive -- my understanding

 9     is he can't receive a year-off credit for it because of the

10     possession of the firearm.

11              THE COURT:  Well, you never know, those things could

12     change.

13              MR. KLEIN:  The other thing, Your Honor, is that

14     Mr. Gonsalves had submitted a statement to the court and I

15     would ask that that statement be made a part of the

16     presentence report and attached to it.  I think the court has

17     to order it.  That's what I was advised by Ms. Asasaki.

18              THE COURT:  Any objection to that?

19              MR. MUEHLECK:  No.  No, Your Honor.

20              THE COURT:  I'll direct that.

21              All right.  I'm recommending drug treatment, alcohol

22     treatment, mental health, vocational training and

23     opportunities for education.  I'll recommend Safford, Lompoc

24     or Terminal Island.  I will also recommend the 500-hour drug

25     program for the defendant.
```

1          Mr. Gonsalves, what you did you knew was wrong when

2     you did it and unfortunately, what you did hurt the community.

3     But you have an opportunity now to repay society and to

4     rehabilitate yourself.  I specifically have indicated that you

5     should be given the opportunity for educational and vocational

6     training.  You can actually complete a college degree while

7     you are in prison.  And if you avail yourself of those

8     opportunities, when you come out you'll be in a much better

9     position to be able to live an appropriate and beneficial

10    life.

11          I'm sorry that you availed yourself of drugs as a way

12    to make money.  You yourself may have been a victim of

13    somebody else at sometime who brought drugs in.  It's a

14    vicious cycle.  One person brings it in, another person gets

15    involved, then they start bringing it in so that they can pay

16    for their habit and make money.  And then others get involved

17    and it becomes a chain of broken lives, broken hearts and a

18    devastated community.  And you are one of just many who were

19    involved in this.

20          I don't think -- and I've been in this business a

21    long time.  I was a lawyer for 16 years and I've been a

22    federal judge for almost 17 on top of that.  And I was a

23    pretty good cross-examiner when I was a practicing lawyer and

24    I'm a fairly good judge of character.  I don't think that you

25    are a person who is bad at heart.  I think you've done some

1    bad things, but I don't think you are a bad person.  I think
2    you are certainly capable of coming out of jail and living a
3    decent and wholesome life.

4           Now, I've sentenced people who are bad people here,
5    there's no question about it, and there's no question in my
6    mind when they come out of jail they're going to be just as
7    bad as when they went in.  I don't think that's the case for
8    you.  The difference is your attitude.  If you go to jail with
9    a bitter attitude, you'll come out of jail a broken man.  If
10   you go into jail and recognize that you put yourself there,
11   you made some mistakes, but now you're going to rectify it and
12   turn your life around, you take advantage of the opportunities
13   which I will make available to you, the educational
14   opportunities, the vocational training opportunities, you do
15   that and instead of coming out a broken man, you'll come out a
16   new man and you will be in a much better position to be a
17   productive member of society, to provide for your family and
18   to be a role model for your children.  So the difference is
19   entirely up to you.  Entirely up to you.

20          And I've seen people go in, I've been on this bench
21   long enough, I've seen people go to jail and come out, even
22   for a long time, come out, they get back to drugs, they go
23   right back to jail.  And I've seen others who have made
24   decent, productive lives for themselves.  And you're young
25   enough, fortunately, to still have that opportunity.  And I

1    hope you'll take advantage of it.

2           Mr. Muehleck?

3           MR. MUEHLECK:   In accordance with the plea agreement,

4    move to dismiss Counts 11, 13, 26 and 34, Your Honor, as to

5    this defendant.

6           THE COURT:   Motion is granted.

7           MR. MUEHLECK:   Thank you.

8           THE COURT:   Court stands in recess.

9           MR. KLEIN:   Thank you, Your Honor.

10          (The proceedings concluded at 2:26 p.m., June 1,

11   2004.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          COURT REPORTER'S CERTIFICATE

2          I, CYNTHIA TANDO FAZIO, Official Court Reporter,

3    United States District Court, District of Hawaii, Honolulu,

4    Hawaii, do hereby certify that the foregoing pages numbered 1

5    through 34 is a correct transcript of the proceedings had in

6    connection with the above-entitled matter.

7
          DATED at Honolulu, Hawaii, September 9, 2004.
8

9

10          _____
                 CYNTHIA TANDO FAZIO, RMR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25